IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| EZEIKIEL NEVITT, | ) |
| | ) |
|    Plaintiff | ) |
| | ) |
| v. | )  CASE NO. 2:12-CV-2150-AKK |
| | ) |
| UNITED STATES STEEL CORPORATION, | ) |
| | ) |
|    Defendant. | ) |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

**Introduction**

Taking the facts in the light most favorable to defendant U.S. Steel, U.S. Steel revoked the conditional job offer it made Nevitt because it regarded Nevitt as disabled within the meaning of the ADA Amendments Act (ADAAA). The U.S. Steel company doctor placed restrictions on Nevitt that were contrary to the objective medical evidence, that were premised on a speculative fear of future injury, and that precluded Nevitt from employment at U.S. Steel. Nevitt had completely recovered from a prior back injury, had been released to return to work without restrictions, and had a completely normal medical examination with U.S. Steel. Nevertheless, U.S. Steel's company doctor restricted Nevitt to light duty work. Therefore, Nevitt is entitled to partial summary judgment as to liability on his ADA regarded as claim.

Nevitt does not seek summary judgment on his medical inquiries claim.

**Facts in the Light Most Favorable to U.S. Steel**

1. Zeke Nevitt applied for a utility (labor) position at U.S. Steel, received a conditional offer of employment, and was evaluated by the U.S. Steel medical staff on August 24, 2011. [Szabo Dep. (Pl. Ex. 2) at 172; Wilbert Dep. (Pl. Ex. 3) at 47]

2. The physical exam included various tests intended to identify musculoskeletal problems. [Wilbert Dep. (Pl. Ex. 3) at 21-22, 34; Szabo Dep. (Pl. Ex. 2) at 160-61]

3. Nevitt's physical exam was normal. [Wilbert Dep. (Pl. Ex. 3) at 30, 42; Szabo Dep. (Pl. Ex. 2) at 172] Nevitt had no sign of having a problem with his back on that date. [Szabo Dep. (Pl. Ex. 2) at 3]

4. Nevitt did disclose a history of a back injury that had been treated with pain medications but which left no residual problems. [Wilbert Dep. (Pl. Ex. 3) at 30, 42]

5. Nevitt had an on-the-job back injury in January 2011, but by June 2011 Nevitt was working regular duty with no restrictions. [Nevitt Dep. at 65, 91-93]

6. U.S. Steel requested additional information regarding the back injury, and Nevitt provided two doctor notes, one from Dr. Robert Poczatek dated May 12, 2011, and one from Dr. Andrew Cordover dated May 27, 2011. [Nevitt Dep. (Pl. Ex.

1) at 146-48, 176; Poczatek note (Pl. Ex. 6); Cordover note (Pl. Ex. 7)]

7. Nevitt retrieved the Poczatek note from his car on the date of the medical exam. [Nevitt Dep. (Pl. Ex. 1) at 146-48]

8. Nevitt got the Cordover note from the doctor's office after receiving an email from U.S. Steel on or about August 26, 2011, requesting "medical records" regarding his back injury. [Nevitt Dep. (Pl. Ex. 1) at 176, 275; 08-26-11 U.S. Steel Email (Pl. Ex. 10)]

9. Nevitt understood from his communications with the U.S. Steel nurse (Wilbert) that he had satisfied U.S. Steel's request for records by providing the two notes. [Nevitt Dep. (Pl. Ex. 1) at 176-77]

10. While the May 12 Poczatek note included some restrictions of uncertain duration,[1] the later (May 27) Cordover note completely released Nevitt with no restrictions. [05-12-11 Poczatek Office Note (Pl. Ex. 6); 05-27-11 Cordover Release (Pl. Ex.7)]

11. Nevitt provided the Cordover release on or prior to August 30, 2011. [U.S. Steel Physical Examination Report (Pl. Ex. 9); Szabo Dep. (Pl. Ex. 2) at 101-02]

12. U.S. Steel never informed Nevitt that there was any deficiency or issue

---

[1] The Poczatek restrictions were temporary, limited to 4 weeks, but U.S. Steel did not have the contemporaneous note stating this fact at the time it withdrew its conditional offer. [05-12-11 Poczatek Worker's Compensation Form (Pl. Ex. 8)]

with the medical release he provided from Dr. Cordover. [Nevitt Dep. (Pl. Ex. 1) (Pl. Ex. 1) at 175]

13.    Rather, in an email dated September 15, 2011, U.S. Steel informed Nevitt that the job offer was withdrawn, stating: "It has been determined that you do not meet the qualifications of the Utility Person, 1450BR, position for which you applied.  Therefore, the contingent offer of employment . . . is rescinded." [05-15-11 U.S. Steel Email (Pl. Ex. 11)]

14.    The withdrawal of the offer was based on restrictions imposed by the company medical director, Cheryl Szabo, M.D., who reviews the information obtained as a result of the medical exam and decides whether any restrictions will be placed on the applicant. [Wilbert Dep. (Pl. Ex. 3) at 23-24]

15.    Dr. Szabo considered Nevitt to suffer from chronic pain and considered his back injury history to permanently preclude him from working at U.S. Steel. [Szabo Dep. (Pl. Ex. 2) at 113]

16.    Dr. Szabo placed restrictions on Nevitt of no lifting more than 20 pounds, 10-minute breaks every two hours, and no repetitive movement of the back. [Wilbert Dep. (Pl. Ex. 3) at 25-26; U.S. Steel Physical Examination Report (Pl. Ex. 9)]

17.    These restrictions are considered light duty. [Szabo Dep. (Pl. Ex. 2) at

130]

18.     Dr. Szabo placed these restrictions on Nevitt to prevent Nevitt from aggravating his back, though she could not say Nevitt would ever have a problem with back pain in the future and conceded Nevitt was not in any immediate danger of aggravating his back if he went to work for U.S. Steel. [Szabo Dep. (Pl. Ex. 2) at 92-100, 155-56, 174-76]

19.     According to Dr. Szabo, even if she had been provided the complete medical records of Dr. Poczatek and Dr. Cordover, including the note that showed Dr. Poczatek's restrictions were temporary, [05-12-11 Poczatek Worker's Compensation Form (Pl. Ex. 8)], she would have imposed the same restrictions on Nevitt. [Szabo Dep. (Pl. Ex. 2) at 105, 131-34]

20.     U.S. Steel's policies permitted Dr. Szabo to require Nevitt to undergo further testing to address any questions or concerns about whether Nevitt could safely do the job, but Dr. Szabo chose not to order any further evaluation of Nevitt. [Szabo Dep. (Pl. Ex. 2) at 119-20]

21.     In fact, Dr. Szabo has never had a person undergo further testing or examination before she imposed restrictions. [Szabo Dep. (Pl. Ex. 2) at 120]

22.     Dr. Szabo did not even meet or talk with Nevitt even though she says subjective information regarding a person's pain and the person's thoughts about his

or her ability to do the job are "important." [Nevitt Dep. (Pl. Ex. 1) at 265-66; Szabo Dep. (Pl. Ex. 2) at 37]

23.   Dr. Szabo believes the utility job requires regular lifting of objects weighing 80-100 pounds, [Szabo Dep. (Pl. Ex. 2) at 43], but U.S. Steel managers testified the job only required lifting 50 pounds, [Reed Dep. (Pl. Ex. 4) at 11, 16; Thompson Dep. (Pl. Ex. 5) at 8, 16].

## Argument

**I.   The ADAAA Substantially Broadens the Scope of Regarded as Claims.**[2]

As originally enacted twenty years ago, the ADA was intended "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Among other things, the statute prohibited employers from discriminating against a "qualified individual with a disability" because of that individual's disability. *Id.* § 12112(a). The term "disability" was defined to mean: "[1] a physical or mental impairment that substantially limits one or more of the major life activities of such individual, [2] a record of such an impairment, or [3] being regarded as having such an impairment." *Id.* § 12102(2). Congress also enumerated several defenses to liability, including an

---

[2]   Accordingly, courts interpreting the ADAAA have generally found pre-amendment case law unhelpful. *See Snyder v. Livingson*, No. 1:11-CV-77, 2012 WL 1493863 at *7-8 (N.D. Ind. April 27, 2012).

individual's failure to satisfy a qualification standard of not posing a "direct threat to the health or safety of others in the workplace" that could not be eliminated by a reasonable accommodation. *Id.* § 12113(a)-(b).

Over the next two decades, as plaintiffs filed lawsuits and courts interpreted the statutory language, it became harder and harder for plaintiffs to show that they were among the group of people protected by the ADA. Courts imposed stringent requirements for individuals to show that they were "substantially limited" in a "major life activity." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196-98 (2002). Even when an individual's impairment was admittedly the basis for an employment decision, courts required plaintiffs who sought coverage based on the "regarded as" prong of the disability definition to prove the employer's perception of their limitations. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489-91 (1999). Increasingly, plaintiffs lost lawsuits on the ground that the statute did not cover them, meaning that courts often did not reach the question of whether an employer's conduct was discriminatory. *See* Chai R. Feldblum, "Definition of Disability Under Federal Anti-Discrimination Law: What Happened? Why? And What Can We Do About It?" 21 *Berkeley J. Emp. & Lab. L.* 91, 140 (2000) (criticizing "a reading of the ADA that has radically reduced the number of people who can claim coverage under the law").

With the ADAAA of 2008, Congress asserted its intention "to restore the intent and protections of the Americans with Disabilities Act of 1990." Pub. L. No. 110-325, preamble, 122 Stat. 3553 (2008). Congress explained that it had "expected that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973, [but] that expectation has not been fulfilled." *Id.* § 2(a)(3) (codified at 42 U.S.C. § 12101 note). Criticizing the Supreme Court for "eliminating protection for many individuals whom Congress intended to protect," *id.* § 2(a)(4), Congress expressly repudiated the holdings of *Sutton* and *Toyota Motor Manufacturing*, *id.* §§ 2(a)(4)-(7). Congress declared that a purpose of the ADAAA was to "reinstat[e] a broad scope of protection to be available under the ADA." *Id.* § 2(b)(1). Explaining that previous judicial decisions had made it too difficult for individuals to prove coverage, *id.* § 2(b)(4)-(5), Congress stated that "it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.* § 2(b)(5).

Regarding the third prong of the definition (regarded as), Congress singled this section out as demanding a "broad view." *Id.* § 2(b)(3) (codified at 42 U.S.C. § 12101

note).

The ADA regulations acknowledge and incorporate this statutory history, stating that Congress amended the ADA "to make it easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). According to the regulations, the definition of "disability" is to be construed broadly in favor of expansive coverage, and the primary focus in ADA cases "should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." 20 C.F.R. § 1630.1(c)(4). Consistent with this purpose, "while the ADA previously required the perceived disability to substantially limit a major life activity, the [ADAAA] removed this hurdle," and the "ADA now includes perceived disabilities 'whether or not the impairment limits or is perceived to limit a major life activity.'" *Becker v. Elmwood Local School Dist.*, No. 3:10 CV 2487, 2012WL13569 at *9 (N.D. Ohio Jan. 4, 2012) (quoting 42 U.S.C. § 12102(3)(A)).

Under the ADAAA, an employer is now deemed to regard an employee as disabled whenever it takes a prohibited employment action, so long as the actual or perceived physical or mental impairment is not both transitory and minor. 42 U.S.C. § 12102(3)(A)-(B); 29 C.F.R. § 1630.2(g)(1)(iii), (l). The regulations state:

(l) "*Is regarded as having such an impairment*." The following principles

9

apply under the "regarded as" prong of the definition of disability (paragraph (g)(1)(iii) of this section) above:

(1) Except as provided in§ 1630.15(f), an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity. Prohibited actions include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment

(2) Except as provided in§ 1630.15(f), an individual is "regarded as having such an impairment" any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action.

29 C.F.R. § 1630.2(l).

Regarding "transitory and minor" impairments, the regulations make clear this is a defense and not part of a plaintiff's claim:

(f) *Claims based on transitory and minor impairments under the "regarded as" prong.* It may be a defense to a charge of discrimination by an individual claiming coverage under the "regarded as" prong of the definition of disability that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) "transitory and minor." To establish this defense, a covered entity must demonstrate that the impairment is both "transitory" and "minor." Whether the impairment at issue is or would be "transitory and minor" is to be determined objectively. A covered entity may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the covered entity must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor. For purposes of this section, "transitory" is defined as lasting or expected to last six months or less.

29 C.F.R. § 1630.2(l).

**II.    Nevitt Is Entitled to Partial Summary Judgment as to Liability on His ADAAA Regarded as Claim Because U.S. Steel Perceived Nevitt as Having a Significant Impairment of Indefinite Duration Not Supported by the Medical Evidence.**

    **A.    The Elements of a Regarded as Claim and Applicable Defenses under the ADAAA.**

The four elements of an ADAAA claim, as applied to this case, are: (1) Nevitt was perceived as having an impairment; (2) he was a "qualified individual;" (3) he was subjected to an adverse employment action; and (4) the perceived impairment was a substantial or motivating factor that prompted U.S. Steel to take that action. *See Collado v. United Parcel Service, Co.*, 419 F.3d 1143, 1152 n.5 (11th Cir. 2005).

While U.S. Steel must show that the perceived impairment would be both transitory and minor, 29 C.F.R. § 1630.2(l), under current Eleventh Circuit law, Nevitt bears the burden of showing he was not a direct threat. *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 836 (11th Cir. 1998) (plaintiff has burden of proving absence of direct threat).[3] However, an employer is entitled to a "direct threat" defense only if the individual in question actually poses "a significant risk of substantial harm." 29 C.F.R. § 1630.2(r). An employer misjudges the objective evidence at its own peril. *See Bragdon v. Abbott*, 524 U.S. 624, 649-50 (1998)

---

[3]    There is a circuit split on this issue.

(employer's "belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability . . . courts should assess the objective reasonableness of the [employer's] views").

The ADA defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). The EEOC has clarified that an employer "is not permitted to deny an employment opportunity to an individual with a disability merely because of a slightly increased risk. The risk can only be considered when it poses a significant risk, i.e., high probability, of substantial harm; a speculative or remote risk is insufficient." Interpretive Guidance on Title I of the ADA, 29 C.F.R. Pt. 1630, App. § 1630.2(r); *see also Bragdon*, 524 U.S. at 649 ("Because few, if any, activities in life are risk free, *Arline* and the ADA do not ask whether a risk exists, but whether it is significant."); *Hamlin v. Charter Tp. of Flint*, 165 F.3d 426, 432 (6th Cir. 1999) (direct threat requires "high probability of potential harm"); *Estate of Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 403 (6th Cir. 1998) (court "must not consider the possibility of HIV transmission, but rather focus on the probability of transmission") (emphasis added). In determining whether an individual poses a significant risk, an employer must rely on "an individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. Pt. 1630, App.

12

§ 1630.2(r); *see Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) (a determination "which focuses on the medical condition's actual effect on the specific plaintiff [ ] lies at the heart of the ADA"); *EEOC v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1097 (6th Cir. 1998) ("the principal purpose of the regulation is to prohibit employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics").

A speculative concern about future injury, however, is not a legitimate basis for concluding that an applicant or employee is a direct threat to himself. *See Chevron USA, Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (stating that "[t]he direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended") (quoting 29 C.F.R. § 1630.2(r)).

### B. The Medical Evidence and the Testimony of Szabo Require Partial Summary Judgment in Nevitt's Favor.

Based on the medical evidence and the testimony of Szabo, Nevitt easily

13

establishes these elements and defeats U.S. Steel's "transitory and minor" and direct threat defenses. It is undisputed that Szabo and U.S. Steel perceived Nevitt as suffering from a back condition; that Szabo and U.S. Steel perceived the condition as chronic and severe enough to limit Nevitt to light duty work; that the risk from which Szabo sought to protect Nevitt was not serious injury or death, only a return of his back pain; that Szabo and U.S. Steel perceived that condition to last longer than six months (from January 2011 to September 2011 and into indefinite future); and that U.S. Steel withdrew its conditional offer of employment based on its perceptions.

It is also undisputed that Nevitt is qualified. Under the ADA, a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the job." 42 U.S.C. §1211(8); *see also D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229, 1234 n.6 (11th Cir. 2005) (employee's own testimony and prior job performance sufficient to create fact issue). Indisputedly, Nevitt meets the educational and experiential requirements necessary to perform the functions of a utility person, as defendant offered him the job, and Nevitt's own testimony and that of Dr. Szabo establish that Nevitt could physically do the job. According to Szabo, she imposed restrictions to protect Nevitt from possibly being injured in the future; she never claimed Nevitt was not able do the job.

Just as Nevitt has shown he was indisputably qualified, he has indisputably

shown he was not a direct threat. The objective medical information, indeed all the medical information, subjective and objective, shows that Nevitt was completely recovered from the prior back injury.

U.S. Steel cannot escape liability because it relied on a doctor. Of course, this doctor was a company employee likely concerned about worker's compensation costs, but even if Szabo was not the company medical director, an employer acts at its peril when it acts contrary to the objective medical evidence. *See Taylor v. Pathmark Stores, Inc.*, 177 F.3d180, 193 (3d Cir. 1999) (no reasonable mistake defense); *see also Holiday*, 206 F.3d at 644-45 (citing *Taylor* and stating, among other things, that "[c]ourts need not defer to an individual doctor's opinion that is neither based on the individualized inquiry mandated by the ADA nor supported by objective scientific and medical evidence").

Moreover, even under the old ADA, it was well-established that a fear of future injury will not support the withdrawal of a conditional job offer. An analogous case is *Garrison v. Baker Hughes Oilfield Operations, Inc.*, in which the court stated:

> [T]he employer may only withdraw the conditional job offer if "performance of of the essential job functions cannot be accomplished with reasonable accommodation." [29 C.F.R. § 1630.14(b)(3)]. The Equal Employment Opportunity Commission further explains:
>
>> The results of a medical inquiry or examination may not be used to disqualify persons who are currently able to perform the essential

> functions of a job, either with or without an accommodation, because of fear or speculation that a disability may indicate a greater risk of future injury, or absenteeism, or may cause future workers' compensation or insurance costs.
>
> Equal Employment Opportunity Commission, Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act § 6.4 (1992) (hereinafter Equal Employment Opportunities Commission Technical Assistance Manual).

287 F.3d 955, 960 (10th Cir. 2002) (footnote omitted).

## Conclusion

For the above stated reasons, the Court should grant plaintiff's motion, enter judgment as to liability on plaintiff's ADA "regarded as" claim, and grant plaintiff such other and further relief to which he is justly entitled.

*/s/ Henry F. Sherrod III*
_____
Henry F. Sherrod III (ASB-1200-D63H)
HENRY F. SHERROD III, P.C.
119 South Court Street
P. O. Box 606
Florence, Alabama 35631-0606
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

    I hereby certify that on October 23, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: William H. Morrow and Anthony F. Jeselnik.

*/s/ Henry F. Sherrod III*
_____

17